IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SHARON MONDRY,

                Plaintiff,

     v.

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY and
AMERIPREFERRED PPO PLAN,

               Defendants.

OPINION AND ORDER

06-cv-320-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

It took plaintiff Sharon Mondry more than four years to obtain the insurance reimbursement due her for speech therapy services provided her young son.  After she was reimbursed, she brought suit against her employer, defendant American Family Mutual Insurance Company, its insurance plan, defendant AmeriPreferred PPO Plan, and the claims administrator for the plan, Connecticut General Life Insurance Company, a subsidiary of CIGNA Corporation, alleging violations of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, and federal criminal law and seeking a variety of remedies.  (Defendant AmeriPreferred PPO Plan plays no independent role in this suit; for all purposes, American Family is the only defendant.)

1

At the time her son received the services, plaintiff worked for defendant American Family Mutual Insurance Company and was a participant in its AmeriPreferred PPO Plan. Her claim for reimbursement of the costs of speech therapy was denied by CIGNA, defendant's claims administrator, because, according to a "clinical resource tool" it used, such services were not covered unless they were restorative in nature. Over the course of her appeal of the initial decision, plaintiff sought a copy of the clinical resource tool, as well as copies of a second resource tool relied on by CIGNA and the agreement between defendant and CIGNA that CIGNA told her she should have for her appeal. The two resource tools were in CIGNA's sole possession; both CIGNA and defendant had copies of the service agreement, but plaintiff never asked defendant for a copy of this document. Defendant did not produce the resource tools it was asked about; eventually CIGNA did.

In earlier proceedings, Judge Shabaz decided that defendant had no responsibility to produce the resource tools, but the Court of Appeals for the Seventh Circuit held to the contrary. It has remanded the case to this court to determine the appropriate statutory penalties for the failure to produce documents under 29 U.S.C. § 1024(b)(4). It remanded on a second issue as well: whether defendant violated a fiduciary obligation to plaintiff by failing to produce the requested documents. The court of appeals affirmed Judge Shabaz's dismissal of the complaint against CIGNA, on the ground that the statutory obligation to produce documents applies only to the plan administrator and does not apply to claims

2

administrators.  The counts of the complaint alleging criminal violations were not before the court of appeals; plaintiff did not appeal Judge Shabaz's dismissal of these counts.

Upon remand, a trial was held to determine whether defendant had breached its fiduciary duty to plaintiff and what statutory penalties were appropriate for defendant's failure to secure the documents plaintiff sought.  Now that I have heard the evidence, I conclude that plaintiff is entitled to statutory penalties in the amount of $30 a day for the 309-day delay in the production of the resource tools.  In reaching this conclusion, I have taken into consideration the length of the delay; the prejudice to plaintiff, the efforts that defendant made to help plaintiff; plaintiff's failure to communicate early in the process exactly what documents she wanted and why the documents were important to her efforts to obtain her insurance benefits; and the state of the law at the time the requests for the resource tools were made.  No statutory penalties are imposed for the nonproduction of the general service agreement governing CIGNA's administration of claims under defendant's plan because plaintiff never made defendant aware that she wanted a copy of this document. Plaintiff never made a written request of defendant for a copy of the agreement or even sent defendant a copy of any communication in which she asked CIGNA for the agreement.

I conclude that defendant American Family breached its fiduciary duty to plaintiff by not taking additional steps to help her obtain copies of the two resource tools although it did not have them in its possession.  It is a close question.  Neither plaintiff nor her counsel

3

made it clear to defendant for some time just what the dispute with CIGNA entailed or the relevance of the documents plaintiff was seeking.  Moreover, the employees of defendant to whom plaintiff talked did not view the resource tools as critical documents, for two reasons: they believed that plaintiff's son met the plan's criteria for coverage even under the more restrictive language of the resource tools and they knew that the plan document established the terms of coverage and overrode the terms of any resource tool.  However, once defendant did become aware of plaintiff's reasons for wanting the tools, it did not exert the effort to help plaintiff that would have fulfilled its fiduciary duty to her.  Under the court of appeals' ruling and the parties' stipulation, plaintiff is entitled to $603.25 (the lost time value of the money she paid out of her own pocket for her son's speech therapy before she was finally reimbursed).

From the evidence presented at the trial, I find the following facts.

FACTS

A. Background

Sharon Mondry was an employee of defendant American Family Mutual Insurance Company with a well-paid and responsible position when she decided to adopt a child.  As a single mother at an age when most mothers are sending their children into the workplace or off to college, she took on the care of an infant.  Zev appeared to be developing normally

4

until he was about 18 months old and his development slowed.  His doctor diagnosed pervasive developmental disorder and told plaintiff that Zev might be autistic.  Among other things, Zev lost his ability to say even the few words he had learned earlier.

Although Zev had access to speech therapy through a publicly-funded Birth to Three program, plaintiff believed that he would benefit from a more intensive form of speech therapy.  She applied for his admission to the privately-run Communication Development Center and was advised in December 2002 that the center would take Zev as a patient.  She called CIGNA, the third-party claims administrator of the American Family health insurance plan in which she was enrolled (with Zev as a beneficiary), and asked what she needed to do to have Zev's sessions covered by insurance.  CIGNA told her that she needed a letter from Zev's pediatrician, stating that the sessions were medically necessary, and a letter from the speech therapist describing Zev's treatment plan.  She submitted these documents to CIGNA; the center submitted copies of its bills to CIGNA.

## B. Correspondence and Telephone Calls

In a letter dated June 13, 2003, CIGNA wrote to Zev's speech therapist, saying that the therapy provided to Zev was not covered by defendant's plan because

> [t]he information provided does not meet plan language for speech therapy per CIGNA guidelines.  Patient has expressive language skills delay and auditory comprehension skills impairment.  Speech therapy to address this 1delay is

5

educational or training.  Speech therapy is not restorative.

Based on CIGNA's Benefit Resource Tools Guidelines - Speech Therapy.

The letter included information about an appeal process.  A copy was sent to plaintiff, but not to defendant.

Immediately after receiving this letter, plaintiff called Stacy McDaniel, a benefits specialist in defendant's Human Resources Department, asking about the terms of the plan. McDaniel told her that the plan was on the website.  Plaintiff checked the plan but found nothing that explained the basis for CIGNA's denial of the plan or anything about the CIGNA Benefit Resource Tools Guidelines for speech therapy.  [Throughout this case, the parties have disagreed about the "plan" that was on defendant's internal website.  Plaintiff understood it to be a Summary Plan Description and believed that defendant had a copy of the actual plan document that it was refusing to turn over. Defendant has maintained consistently that the Summary Plan Description *is* the plan document and no other document exists, although it does not deny that it referred to the website document as the Summary Plan Description.  It appears that defendant is correct, but it is not surprising that the terminology caused confusion.).

Plaintiff called McDaniel back to say there was "nothing on the website" and asked whether there were additional documents she hadn't seen.  McDaniel told her to talk to CIGNA, which plaintiff did without success.

6

Shortly afterward, at a gathering for families of autistic children, plaintiff met a lawyer who suggested she come to his firm, a non-profit organization specializing in health care problems.  He advised her to put her requests to CIGNA in writing.  She followed this advice and wrote to CIGNA on **June 30, 2003**.  (Because plaintiff wrote many more letters to CIGNA than to defendant and it is important to know which ones went to which entities, I have put in bold the dates of the letters that went to both.  CIGNA never sent defendant a copy of any letter it sent to plaintiff.)  In the June 30 letter, plaintiff said

> I am attaching a copy of a denial letter I recently got from CIGNA for speech therapy for my son.
>
> I want to appeal the denial, and am requesting a complete copy of the Plan documents.  The document I was told to pull off the American Family Intranet site is a Summary Plan Description, and is incomplete.

Trial exh. #2.  The letter made no reference to a resource tool.  A copy of this letter went to Ken Dvorak, director of defendant's Benefits Department and McDaniel's supervisor.

On July 11, 2003, plaintiff received a letter from CIGNA, acknowledging her June 30 letter and saying that it was treating the letter as a first level request that would be reviewed by someone not involved in the original decision.  Tr. exh. #3.  CIGNA added that if plaintiff was not satisfied with the result of the first level appeal, she could request a second level review within one year of the determination letter.  Id.

7

On July 23, 2003, CIGNA wrote plaintiff to tell her that her claim had been denied again, on the ground that the speech therapy was not shown to be restorative but rather intended to improve speech skills that were not fully developed.  It added, "Reference CIGNA Clinical resource tool for Speech Therapy."  Tr. exh. #4.  Dissatisfied with this response, plaintiff wrote again to CIGNA on **July 28, 2003**, with a copy to Dvorak, saying that she was writing again about the denial of speech therapy for her son and repeating her request for CIGNA's plan documents.  Tr. exh. #5.  She did not say that she wanted copies of the resource tools.  She enclosed copies of her **June 30, 2003** letter to defendant asking for a copy of the plan document and CIGNA's July 11, 2003 response, saying that it was treating plaintiff's letter as a first level appeal..  She did not say that she was enclosing a copy of the denial letter and there is no other evidence  that she did.

Plaintiff's counsel, Jonathan Cope, wrote to CIGNA and defendant on **September 23, 2003**, to renew plaintiff's request for the plan documents in effect at the time coverage was denied for her son Zev.  Tr. exh. #6.  On October 16, 2003, McDaniel wrote to plaintiff to say that she was sending plaintiff a copy of the AmeriPreferred Summary Plan Description, which was the plan document, that no separate plan document existed, that the complete plan was on the website and that it was available to all employees.  Tr. exh. #7.

In October 2003, defendant began downsizing.  Plaintiff made a special request for a buyout opportunity so that she could work at home and take care of her son.  At the time

8

she thought that she had sufficient funds to support both of them with a part-time job. Unfortunately, she underestimated the financial demands of her son's care and her ability to start and sustain her own business. Her life spiraled downward financially and eventually she was forced to go on welfare.

In the meantime, plaintiff's lawyer continued to write CIGNA to ask for copies of plan documents. In an **October 30, 2003** letter to CIGNA, of which Dvorak received a copy, counsel pointed out that CIGNA's July 23, 2003 denial letter had referred to a Clinical Resource Tool for Speech Therapy that was not part of the Summary Plan Description available to plaintiff. Tr. exh. #8. This is the first communication to defendant in which plaintiff made a specific request for the resource tool and her reason for needing it. Counsel reminded CIGNA that it had said that plaintiff was entitled to free copies of all documents relevant to her appeal. Counsel asked CIGNA to send the copies of the documents, including the Clinical Resource Tool and any other documents relied upon in denying plaintiff's claim. Id. Counsel also asked CIGNA to clarify whether plaintiff had 180 days in which to request a second level appeal, as stated in the summary plan or whether it had the full year, as CIGNA had stated in its denial letter. Id.

In a letter to plaintiff dated December 10, 2003, CIGNA said it needed more information and asked for a signed release form, authorizing plaintiff's representative to receive information on her behalf. Tr. exh. #9. In the same letter, CIGNA refused counsel's

9

request for a copy of the Summary Plan Description, saying plaintiff should request it from defendant.

On **January 7, 2004**, plaintiff's counsel wrote to CIGNA and to defendant, asking again for copies of the relevant plan documents.  Tr. exh. #11.  Counsel emphasized the potential penalties that could be assessed against plan administrators that failed to provide copies of documents that were relied upon to make an adverse determination.  Counsel sent a copy of the letter to the Department of Labor, Employee Benefits Security Administration. Counsel wrote again on **January 28, 2004**, with copies to defendant, and the Department of Labor, reiterating plaintiff's request for "the plan language used as the premise for CIGNA's denial of Zev Mondry's speech therapy" as well as a copy of the Clinical Resource Tool for Speech Therapy.  Tr. exh. #12.  CIGNA responded by fax on February 20, 2004, saying that "the CIGNA tool used is only available to internal CIGNA agencies."  Tr. exh. #13.

Counsel faxed defendant's corporate counsel on **April 21, 2004**, asking for a copy of the plan document, saying that plaintiff had a copy of the summary plan description but had never received a copy of the plan document, and asking for "the rules, guidelines, or protocols used as the premise for the denial of services."  Tr. exh. #14.  (This was the last written communication to defendant; all of plaintiff's later written communications were with CIGNA only.)

In a June 22, 2004 telephone conversation with plaintiff's counsel, John Pendergast of CIGNA's appeals unit agreed to send a copy of the Clinical Resource Tool to counsel, after reviewing the records and learning that the tool had been relied upon for the denial of benefits.  Tr. exh. #15.  Counsel wrote Pendergast on July 9, 2004 to say that the tool had been received but it did not include the language relied upon for the denial:  specifically, it did not include the term "expressive language delay."  Tr. exh. #16.  Counsel reminded Pendergast that the language relied upon was critical to the appeal and that time was running on the appeal period.  Id.

Pendergast refused to send any other documents, so counsel wrote him again on July 24, 2004, noting counsel's bafflement about Pendergast's statement that CIGNA had no more documents to provide when it had not sent the document on which it had relied to deny plaintiff's claim, leaving plaintiff unable to prepare an appeal.  Tr. exh. #18.  Again, counsel sent copies of the letter to the Department of Labor, as well as to both Wisconsin senators.  It did not send a copy to defendant.

According to an October 21, 2004 letter written to CIGNA by plaintiff's counsel, with no copy to defendant, CIGNA sent counsel a copy of the "CIGNA Health Care Benefit Interpretation Resource Tool for GSA 2001, Requested Service: Speech Therapy (Outpatient)" that counsel received on October 5, 2004.  Tr. exh. #22.  The document identified the "Applicable Plan Document" as "CIGNA HealthCare Group Service

11

Agreement 2001 (GSA 2001)."  Counsel noted in the letter that CIGNA had not included a copy of this agreement with the letter and had never provided it to plaintiff.  Moreover, counsel added, the review standards outlined in the resource tool were not part of defendant's 2002 summary plan description.  Id.

In a comprehensive and specific letter to CIGNA's Pendergast, dated December 21, 2004, plaintiff's counsel pointed out that CIGNA had denied plaintiff's claim in reliance on service limitations that were not part of the summary plan description made available to plaintiff.  Tr. exh. #23.  According to the plan, the cost of medical services and supplies would be covered if they were medically necessary, as well as reasonable and customary.  Id. "Medically necessary" meant that

> the services and supplies are provided by a hospital, doctor, or other medical provider to treat a covered illness or injury.  Id.  The treatment must be appropriate for the symptoms or diagnosis, within the standards of medical practice, the most appropriate supply or level safe for the patient, and not solely for the convenience of the patient, doctor, hospital, or other licensed professional.

As counsel noted, plaintiff could not have anticipated that the standards articulated in a document other than the plan document would apply to her claim.  Id.  Counsel added that although CIGNA had finally produced the document it used to deny plaintiff's claim, it had still not identified any provision of defendant's plan that "either justifies the denial or incorporates the [resource tool] into the terms of the contract," making it impossible for

12

plaintiff to know what standards would be applied to the medical facts.  Id.

In April 2005, plaintiff learned from CIGNA that she had prevailed on her appeal of the denial of payment for Zev's speech therapy.  Tr. exh. #25.  CIGNA gave no explanation for its change of position.  It did not say that it had erred in reading defendant's plan as limiting speech therapy to only restorative services; it did not say that it had been relying erroneously on the language of a different plan, whether one of defendant's plans or another; it did not say whether it had decided it had erred in relying on a document that was not made known to the plan member (or to defendant, the plan administrator); and it did not say whether it had taken a new look at the materials plaintiff had submitted and had determined that Zev's therapy was for restorative purposes.  Although it seemed at this point that plaintiff's long wait for reimbursement was over, CIGNA extended it for ten months before sending her a reimbursement check for the speech therapy bills she had paid.

Plaintiff never requested a copy of the general service agreement from defendant or sent defendant a copy of any communication to CIGNA asking for the document.


## C. Defendant's Response to Plaintiff's Requests

While plaintiff was trying to obtain reimbursement for Zev's speech therapy, she had six to seven conversations with Stacy McDaniel, defendant's benefits specialist.  McDaniel assured plaintiff that the plan on the website was the entire plan document and she made

13

two calls to CIGNA on plaintiff's behalf.  She called Carl Peterson, her contact at CIGNA, in late June or early July 2003, when she first learned about CIGNA's denial of benefits for Zev. Peterson told her that speech therapy was covered if it was restorative.  McDaniel knew that Zev had once had the ability to talk and that the speech therapy had restored that ability.  Peterson told her that plaintiff had not sent CIGNA evidence of the restorative nature of the therapy. After this conversation, McDaniel thought that the only impediment to approval of the claim was plaintiff's failure to have submitted the necessary documentation from Zev's doctor and the speech therapist.  In August 2003, McDaniel emailed CIGNA about plaintiff's claim.  Tr. exh. #211.  CIGNA responded that it had told plaintiff that the claim was not covered unless it was medically necessary and restorative in nature.  McDaniel continued to believe that the claim could be resolved if plaintiff simply submitted the proper documentation to CIGNA about the restorative nature of the therapy. She tried to help plaintiff submit that documentation, to no avail.  Plaintiff refused to send anything to CIGNA until she had the plan documentation; otherwise, she said, CIGNA would simply find another reason to deny her claim.   McDaniel offered to get the documentation from the physician herself and even sent plaintiff a blank authorization form so that McDaniel could submit it for her, but she received nothing.

McDaniel does not remember plaintiff's asking her for copies of CIGNA's resource tools before October 31, 2003.  She never understood that plaintiff was confused about

14

anything except the relationship between the plan document and the summary plan description.

It was not until McDaniel saw the **October 30, 2003** letter from plaintiff's counsel to the Department of Labor, that she realized that plaintiff was seeking a copy of the Clinical Resource Tool. She talked again to Peterson, who told her that the tool was proprietary and he could not send it to her. She then went to Rose Detmer, legal counsel for defendant, to tell her about CIGNA's refusal to turn over the tool. Detmer received the **April 21, 2004** fax from plaintiff's counsel, but did not respond to it until plaintiff's counsel called her several weeks later. At that time, Detmer said that she herself had tried to get a copy of the Clinical Resource Tool but had been unsuccessful. She did not say that she had consulted the service agreement with CIGNA or any other source to determine whether defendant had any legal right to require CIGNA to produce the tool.

Defendant outsources the administration of benefit claims under its employee benefit plans to an outside claims administrator. Among the reasons it does so is to avoid any actual conflict of interest that would arise if defendant's employees were required to handle claims submitted by higher level employees, such as their supervisors. Another is to avoid the perception that attends self-funded benefit plans such as defendant's, which is that the company denies claims to save money and not because the claim itself is defective in some respect. A third is a concern for employee privacy. Claims involving medical care often

15

involve deeply personal matters that employees do not want their co-workers to know about.

Defendant sees the duty of the benefits department as helping employees get a full or fair hearing and not to influence the decision on the claim or even to help the employee win an appeal.  It would be inappropriate for the company to put pressure on the claims administrator to pay any particular claim.  Doing so would raise the same perception of special treatment for one employee that defendant wants to avoid.  The department would have sent CIGNA the medical documentation of Zev's need for restorative speech therapy it was seeking had plaintiff provided it to Director Dvork or to McDaniel.  CIGNA does not send defendant copies of correspondence between it and plan participants for the reasons discussed above, particularly the impropriety of exposing employees to private information about their co-workers.  Dvorak did not receive a copy of the July 23, 2003 letter from CIGNA to plaintiff, tr. exh. #4, explaining its decision to deny coverage of Zev's speech therapy, so he did not understand the significance of the resource tool at the time.

Once a company like defendant contracts with a claims administrator such as CIGNA, it is essentially locked into the relationship for the duration of the contract.  It cannot "fire" its claims administrator unless it has a new one in place to take over the contract and protect the interests of the employees who are covered by the contract. Finding a suitable replacement administrator requires considerable lead time to investigate possibilities and negotiate with one to take over the contract. As a consequence, defendant's

16

bargaining position with any claims administrator is restricted.   However, defendant did terminate its contract with CIGNA at some time after this incident because of dissatisfaction over its handling of defendant's employees' claims, including plaintiff's.

## D. Lawsuit

Plaintiff sued both CIGNA and defendant (and the plan), alleging six counts:  (1) failure to provide required information to plaintiff in violation of 29 U.S.C. § 1024(b)(4); (2) breach of fiduciary duty in violation of § 1024(a)(1); (3) false statement relating to health care matters in violation of 18 U.S.C. § 1035; (4) mail fraud in violation of 18 U.S.C. § 1341; (5) wire fraud in violation of 18 U.S.C. § 1343; and (6) prohibited racketeering activities in violation of 18 U.S.C. § 1962(c).

## OPINION

## A. Statutory Penalty

In deciding the appeal in this case, the court of appeals determined that a statutory penalty under 29 U.S.C. § 1132(c)(1)(B) was appropriate for defendant's failure to comply with its obligation under 29 U.S.C. § 1024(b)(4) to provide plaintiff copies of documents that she requested.   Mondry v. American Family Mutual Insurance Co., 577 F3d 781 (7th Cir. 2009).   The court left the amount of the penalty to be decided by this court.

17

As a general rule, imposing penalties under § 1132(c)(1)(4) is not mandatory; courts have full discretion to impose or withhold them.  Ames v. American National Can Co., 170 F.3d 751, 759-60 (7th Cir. 1999) (court could decline to impose fine when employer found to have acted in good faith, plaintiffs were not prejudiced by failure to produce information and fine was not necessary to advance any purpose of ERISA); see also Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 588 (1st Cir. 1993) (bad faith and prejudice are proper factors for district court to consider when imposing penalty under § 1132(c)(1)); Harsch v. Eisenberg, 956 F.2d 651, 662 (7th Cir. 1992 ("judge may, but need not, consider the provable injury" when exercising discretion to award statutory penalty).   Other factors the court may balance include the length of the delay, the requestor's need to hire a lawyer and engage in litigation  and the plan's failure to keep the requestor informed of difficulties in locating documents.  Lowe v. McGraw-Hill Companies, Inc., 361 F.3d 335, 338 (7th Cir. 2004).

Plaintiff has asked for an award of $110 a day for each day that defendant did not respond to each of plaintiff's 12 written requests for plan documents, for a total amount of $1,053,690.  There may be circumstances in which such a request would be appropriate but this is not one of them.  It is undisputed that plaintiff was treated shabbily by CIGNA, which made a raft of mistakes in handling her claim.  It used an internal resource tool to reach a decision on plaintiff's claim that was contrary to the terms of the AmeriPreferred

18

PPO Plan; it refused to turn over a copy of the correct tool to plaintiff despite its admitted reliance on the tool; it gave plaintiff conflicting advice on her time for appeal; it delayed in responding to her requests and stonewalled many of them, refusing to turn over documents even when asked to do so by representatives of defendant, although defendant was the plan administrator; and perhaps worst of all, made plaintiff wait another ten months for her reimbursement check after she finally prevailed on her appeal.  CIGNA's claim process was slipshod at best; it is questionable, for example, whether it was familiar with the provisions of the AmeriPreferred PPO Plan or even knew that it was the plan governing plaintiff's claim.

The problem is that CIGNA is not liable to plaintiff for its withholding of the resource tools and general service agreement because it has no obligation under ERISA to provide documents relating to the operation of a benefits plan.  <u>Mondry</u>, 557 F.3d at 801 ("CIGNA was not the plan administrator with the statutory obligation to produce plan documents"). Only defendant can be held liable under ERISA for delays in providing plan documents and defendant's actions come nowhere near the degree of recalcitrance or negligence that CIGNA displayed.

The evidence at trial showed that defendant made many efforts to help plaintiff obtain coverage.  These efforts included seven conversations between McDaniel and plaintiff, offers by McDaniel to help plaintiff submit documentation to show that Zev's therapy was restorative, telephone calls by McDaniel to CIGNA's representative and at least two requests

19

of CIGNA for the resource tools.  McDaniel believed that Zev's treatment was covered under the AmeriPreferred PPO Plan even under CIGNA's faulty view of the plan as requiring restorative treatment.  In her view, the claim would be paid as soon as CIGNA saw proof that Zev had needed the treatment to restore his speech, so she directed her efforts to helping plaintiff submit the necessary documentation of the therapy's purpose.

The trial evidence showed also that plaintiff did not make McDaniel or anyone else in defendant's benefits department aware of exactly what she wanted in the way of plan documents and why she wanted them until October 30, 2003, when she sent defendant a copy of the letter from her counsel to CIGNA, explaining that CIGNA had referred to the Clinical Resource Tool in denying plaintiff's claim.  Once McDaniel became aware that plaintiff wanted this document, she called Peterson at CIGNA and asked him for it.

As the court of appeals held, the justification for an award of sanctions is that defendant did not do more to help plaintiff obtain the documents she wanted.  Although its legal counsel made a separate call to CIGNA for the tool, she made no further effort after her first one was rebuffed.  It is not clear whether legal counsel explained to CIGNA exactly why defendant believed that the documents should be turned over, that is, because CIGNA had relied upon them in denying plaintiff's claim. In any event, defendant's counsel did not take any additional steps to get copies of the resource tools from CIGNA.  Defendant offered no evidence that legal counsel asked to speak to a higher level employee, that she wrote any

follow up letter to CIGNA or that she consulted the general service agreement to determine whether defendant had any contractual rights to require CIGNA to turn over the tools.

Plaintiff explained to defendant in her counsel's October 30, 2003 letter that she wanted a document other than the plan document and why she wanted it.  She talked specifically about a copy of the Clinical Resource Tool and said that CIGNA had relied on the tool in denying her claim.  At this point, defendant can be charged with knowing that the tool was an "instrument under which the plan is . . . operated."  § 1024(b)(4); see also Mondry, 557 F.3d at 800 ("Having expressly relied on the [Benefit Resource Tool and the Clinical Resource Tool] as the bases for its decision to deny [plaintiff's] claim for benefits, CIGNA gave those guidelines the status of documents that govern the operation of a plan, and their production to [plaintiff] became mandatory under § 1024(b)(4).").  It is fair to assess defendant penalties for the 215 days between November 30, 2003 (starting 30 days after defendant received the written request for the Clinical Resource Tool, assuming it received it the day after it was written) and July 2, 2004, when CIGNA finally provided the tool to plaintiff's counsel.

The request for the Benefit Resource Tool raises a separate question.  Plaintiff never made an explicit request for this document.  However, it is fair to read the fax that plaintiff's counsel sent to defendant's legal counsel on April 21, 2004, as incorporating such a request. Counsel asked for "a plan document as well as the rules, guidelines, or protocols used as the

21

premise for the denial of services." Tr. ex. #14.  Plaintiff's counsel received the Benefit Resource Tool on October 5, 2004.  Plaintiff is entitled to penalties for the additional 94 days she had to wait from July 2, 2004 until her counsel's receipt of this tool.

The last document at issue is the general service agreement between defendant and CIGNA that sets out the parties' rights and obligations regarding claims administration.  The court of appeals held that plaintiff was entitled to a copy of this agreement (and the resource tools) within 30 days of her written request for them.  Mondry, 557 F.3d at 802-03 ("the plan administrator is liable for its failure to produce these documents to plaintiff within 30 days of her written request for them").   The problem for plaintiff is that she did not introduce any evidence at trial to show that she ever sent a written request to defendant for a copy of this agreement..  She need not have filed a formal written request because it is clear from the court of appeals' holding that it would not have held plaintiff to that standard.  A specific reference to the document in a letter to CIGNA, with a copy to defendant would have sufficed.  Nothing of that sort is in the record.  Moreover, as the record does show, plaintiff's counsel withdrew its request for a copy of the agreement in its December 21, 2004 letter to CIGNA.

It is understandable that plaintiff never made her need for the general services agreement known to defendant.  It was not until July 21, 2004 that John Pendergast mentioned the agreement in his telephone call to plaintiff's counsel and suggested that

22

plaintiff might need it for her appeal.  At that point, plaintiff's lawyers were working primarily with CIGNA; they never advised defendant that plaintiff wanted a copy of the general service agreement.  She directed her two requests for that document to CIGNA in letters dated July 26, 2004 and October 21, 2004, without sending copies to defendant.  In these circumstances, I cannot find that defendant had any statutory liability to plaintiff to produce this document.  None of her earlier communications would have alerted defendant to the fact or even the possibility that plaintiff considered the agreement "an instrument under which [defendant's] plan is established or operated."  Mondry, 557 F.3d at 796.  Unless defendant is to be held liable for not producing any document requested of its claims administrator, even if it had no knowledge of the request, or is to be held to know that any request for a plan document must be read as an implicit request for the general service agreement as well, defendant cannot be held liable for not producing a copy of the agreement.  I will not award any statutory penalties for this alleged failure to produce.

Defendant withheld documents from plaintiff for a total of 309 days after it had written notice from plaintiff that it wanted these documents from defendant.  Plaintiff has asked for the imposition of separate penalties running from each of the many requests it made.  That request will be denied.  Plaintiff has not cited anything in ERISA or in any case interpreting § 1024(b)(4) that would support the running of a new penalty period from the date of each renewed request for production.  Ziaee v. Vest, 916 F.2d 1204 (7th Cir. 1990),

comes the closest.  In that case, the court of appeals suggested that there might be instances in which a new penalty period would start.  For example, if the plan administrator had refused to turn over copies of reports from prior years, a requestor might start a new penalty period in January with a request for a copy of the report for the immediately preceding year. Id. at 1211.  Plaintiff argues that support can be found in 29 U.S.C. § 1132(c)(1)(B), which allows the imposition of penalties on any administrator "who fails or refuses to comply with *a request* for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary," and argues that it would be legal to impose a penalty for each renewed request for the same document.  I need not decide definitively whether the statute allows such a penalty, although I note that Congress provided much of what plaintiff wants by providing for continuing penalties until production occurs.  In this case, it is not necessary to stack penalties to achieve a fair result and plaintiff's suggestion could lead to draconian penalties.

Balancing the length of delay of the production of documents and the prejudice to plaintiff against the uncertain state of the law at the time plaintiff made her requests, the efforts that defendant made to obtain copies of documents not in its own possession and, to a lesser extent, defendant's reasonable belief that plaintiff did not need the resource tools because the plan provisions overrode anything in the tools, I believe that a statutory penalty of $30 a day for 309 days, for a total of $9,270, is a fair and reasonable penalty to impose

24

on defendant.  This compares with the $50 a day penalty imposed in 2001 and approved by the court of appeals in <u>Lowe v. McGraw-Hill Companies, Inc.</u>, 361 F.3d 335, 338 (7th Cir. 2004), on far more egregious facts.  In <u>Lowe</u>, the company refused to send a copy of the plan document to the plaintiff for two years, failed to communicate with him in the interval and did not acknowledge that it had no proof that the document on which it relied to deny him retirement benefits was not valid.

In this case, no larger penalty is necessary for deterrence purposes.  Defendant believed in good faith that it had no obligation under ERISA to turn over copies of resource tools that CIGNA used for evaluating particular medical claims and treated as proprietary information that it did not disclose to anyone outside the company.  This was not an unfounded belief or one that evinced any lack of concern for its employees: defendant knew that the provisions of the resource tools could not override the provisions of the plan in which plaintiff was a participant.  Although the court of appeals found defendant's belief erroneous, defendant does not need a harsher penalty to encourage it to fulfill its responsibilities under ERISA, now that it knows the full scope of those responsibilities.

One final point.  Defendant argues that Wisconsin's two-year statute of limitations for statutory penalties, Wis. Stat. § 893.93(2)(a), bars plaintiff from any award of penalties accruing more than two years before she filed suit on June 14, 2006.  Citing only one unpublished district court opinion that does not support its position, defendant fails to

25

explain why it thinks that a state limitations period would apply to penalties authorized under a federal statute.

## B. Violation of Fiduciary Duty

The court of appeals held that plaintiff had presented evidence at summary judgment "from which a factfinder could determine that [defendant] breached its fiduciary duty to her." Mondry, 557 F.3d at 808.  It based this holding on plaintiff's entitlement to copies of the plan documents under the express terms of § 1024(b)(4), including the resource tools that CIGNA had cited as dispositive of her claim for benefits; plaintiff's inability to mount an effective challenge to the denial of her claim without knowing the contents of the resource tools; defendant's having notice of the documents, plaintiff's reasons for seeking them and "the apparent centrality of those documents to CIGNA's decisionmaking."  Id.  The court acknowledged that in-house counsel talked to CIGNA on plaintiff's behalf to request a copy of the resource tool, but never made any effort to follow up on the request after being told that the tool was proprietary and too big to send.

The court of appeals did not rule definitely on plaintiff's claimed breach of fiduciary duty but indicated that the "factfinder might conclude that [defendant's] heart was not in the effort [to obtain the resource tools]," id., because its attorney made only one call, accepted CIGNA's response without question and did not advise plaintiff's counsel of the

26

result of the call to CIGNA until someone from plaintiff's counsel's office called to inquire. The court added that the "factfinder might conclude that by not taking additional steps on [plaintiff's] behalf to obtain these documents from CIGNA, its agent, [defendant] contributed to the delay and failed to discharge its fiduciary duty as the plan administrator to provide her with the plan documents to which she was entitled by section 1024(b)(4) and which she needed in order to enforce her rights under the AmeriPreferred Plan." Id.

Although the evidence at trial shed a slightly different (and more favorable) light on defendant's efforts to help plaintiff obtain the documents she needed, I cannot say that its efforts would satisfy the court of appeals' standard for meeting its fiduciary duty. In discussing this standard as it applied to ERISA, the court of appeals looked to the common law duty of a fiduciary to fulfill its obligation to beneficiaries by providing them "'such information as is reasonably necessary to enable [them] to enforce [their] rights under the trust or to prevent or redress a breach of trust.'" Mondry, 557 F.3d at 808 (quoting Faircloth v. Lundy Packing Co., 91 F.3d 648, 656 (4th Cir. 1996)). For this ERISA case, the court of appeals adopted the holding of the Court of Appeals for the Fourth Circuit that, "when a fiduciary fails to make the types of disclosures expressly required by [§ 1024(b)(4)], it has breached its fiduciary obligation to the plan beneficiary." Id., citing Rodriguez v. MEBA Pension Trust, 872 F.2d 69, 75-74 (4th Cir. 1989)).

The evidence at trial showed that defendant made many efforts to help plaintiff, both

to improve her chances of persuading CIGNA that Zev's speech therapy was medically necessary as well as to obtain the documents she wanted, but it could have done more to persuade CIGNA to turn over the resource tools, without interfering inappropriately with the disposition of a particular claim.

I conclude that plaintiff is entitled to damages for defendant's breach of its fiduciary damages. The parties have stipulated that the amount is $603.25.

## C. Attorney Fees

Plaintiff has asked for an award of attorney fees but has not specified an amount. She is entitled to a reasonable fee for the hours her counsel reasonably expended in pursuing their ERISA claims against defendant. They should submit an itemization of the hours worked and for what purposes, the name and position of the person doing the work and an itemization of costs incurred.

Plaintiff has asked for an award of attorney fees for work performed in connection with her unsuccessful criminal claims and with her efforts to obtain documents directly from CIGNA. I will deny the request as it relates to the criminal claims, all four of which were dismissed by Judge Shabaz, who found that three of them were brought under statutes that did permit a private right of action, dkt. #29, at 14, and that plaintiff had failed to state a claim on which relief could be granted as to the fourth, plaintiff's Racketeer Influenced and

28

Corrupt Organizations Act claim, 18 U.S.C. § 1962. Id. at 15.  Plaintiff did not appeal this ruling.

As to plaintiff's efforts to obtain documents, I do not believe that attorney fees are appropriate for communications sent only to CIGNA, of which plaintiff had no notice.   I will reserve a ruling on plaintiff's right to attorney fees for its litigation efforts involving both defendants until defendant has had a chance to review plaintiff's itemization of attorney fees and to respond to the request.  (Plaintiff will have an opportunity for a reply.)


ORDER

IT IS ORDERED that plaintiff Sharon Mondry is GRANTED statutory penalties in the amount of $9,270 for defendant American Family  Mutual Insurance Company's violation of its obligation to produce documents under 29 U.S.C. § 1024(b)(4); plaintiff is awarded $603.25 for defendant's violation of its fiduciary duty to her; and plaintiff is entitled to an award of attorney fees and costs, in an amount to be determined.

Plaintiff may have until October 4, 2010 in which to file an itemization of fees and costs, in conformance with this order.  Defendant may have until October 14, 2010 in which

to respond to the request; plaintiff may have until October 21, 2010 to reply.

Entered this 20th day of September, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

30